Good morning, ladies and gentlemen. Oh, please be seated. We'll call these matters as they appear on the calendar. And the first case is Ying-Kui Liu v. Mukasey. Good morning, Your Honors. If it pleases the Court, my name is Wei-Ling Keo, representing the petitioner. This is a denial of political asylum case, and the issue here is only one, credibility. Speak a little louder. The issue in this case is only credibility. The immigration judge found adverse credibility. This case started about five years ago, and it is a pre-Real ID Act case. So the standard of proof for credibility issue is governed by well-established and long-established knife-sharp case laws. And the case law says that if testimony is credible, it alone is sufficient to find credibility. Corroborating evidence is not necessary. However, the immigration judge in this case faulted the petitioner for not producing corroborating evidence. But in fact, the respondent did produce a very probative piece of evidence, a dismissal letter from her employer, which is the Chinese government, accusing her of practicing violent gong, which is... What was the IJ's reason for refusing to admit the letter? The reason was an authentication, because the judge found the evidence was unauthenticated. In order to authenticate a Chinese document, it has to involve the Chinese government. And there's a very recent case law from this circuit about two months ago. He pointed out the impracticality for the asylum applicant to go back to his own country to seek help from the persecutor to authenticate documents that pertains to persecution. In fact, the National Circuit held that testimony alone is another acceptable way of authenticating such documents. And secondly, the standard of proof for credibility is that if the immigration judge found adverse credibility, the evidence must be substantial and must go to the heart of the asylum claim. In this case, I don't believe the immigration judge followed the law, because the judge found several places of inconsistencies and omissions. But in fact, those persistent inconsistencies and omissions were actually minor. It's not substantial. It doesn't go to the heart of the asylum claim. For example, the judge faulted the respondent for changing her testimony whether she took an airplane from Chengdu, which is a thousand miles away from Beijing, the capital, or whether she took a train. The respondent emphatically told the court that she was poor. She had no money to buy airplane tickets. If she had taken a plane, it would take only a couple of hours travel time. But her travel time was two days, so she took a train. This, I think, can be contributed to the interpreter's error, because the Mandarin interpreter in court specifically told the judge at the very beginning of the case that the petitioner's Mandarin was a center of Sichuan province accent. Besides, the petitioner was emotional in court. Another point of inconsistency noted by the immigration judge was the judge asked the petitioner, did the beating render you unconscious as you testified? The petitioner said, no, they slapped my face, caused me dizziness. So this is not to embellish her claim. It is downgrading the harm that she suffered. So I think she's credible in this point. Counsel, could I ask you to go back to the dismissal letter? And I've read the dismissal letter a number of times, and you obviously think that it was prejudicial to not have the letter in. Could you tell me why? All right, Your Honor. This letter, first of all, is from the Chinese government. It is the city treasury department where she worked. The judge said that even if this letter is admissible, it only shows that the petitioner was dismissed from her work because of tardiness from practicing Falun Gong. But actually, this letter corroborates her claim that she is a Falun Gong practitioner. And the letter goes on to say that because of her action of practicing Falun Gong, it specifically says, made bad influence on the workplace. And she did not show any remorse even after education by her employer. So this pertains, it's very positive. It goes to the heart of asylum claim, whether she's telling the truth or not. And again, I will point out to the court that the immigration judge in this case. Didn't the IJ seem to indicate that your client couldn't authenticate that letter we've been talking about by her own testimony? No, the judge did not specifically mention that. I don't think so. The judge did not specifically rule that she cannot authenticate a piece of Chinese document through her own testimony. Because in the immigration court, it is well established that from 8 CFR 286.7, it says that to authenticate foreign documents, it has to go through the country that issued the document, and then finally go through the American embassy in that country. But the federal rule of evidence allows more lenient other ways of authenticating documents, such as by testimony alone. If it's impracticable to authenticate through official means. Well, are you acquainted with one of our recent decisions in this Vatian case? I believe so, yes, Your Honor. What does that hold? That rule says, first of all, it recognizes the impracticality for an asylum applicant to seek help from the country who persecuted that person to help them to authenticate documents that relates to persecution. And secondly, it held that there's other ways, more than one way to authenticate documents, foreign documents, including credible testimony by the applicant himself. Okay. So the real problem was that the IJ just found the evidence incredible, the testimony incredible. You disagree with that for the reasons you've stated, but it's the credibility finding that ultimately led to the refusal to accept, dismiss a letter into evidence. Yes, I think so, Your Honor. And finally, the immigration judge concluded. Let me ask you this. Were there some problems with translation, with the interpreter at the time of the hearing? Several times in the hearing, the interpreter told the judge the accent from the petitioner prevented the interpreter from fully understanding what she was talking about. That's why the interpreter – Or accent. The accent. Because the – She had a different – she was from a different region, right? That's right. She was from Sichuan province, a thousand miles away from Beijing, where Mandarin is the main language. Okay. Why don't you – do you want to save a minute and 56 seconds? All right, Your Honor. All right. I will do that. Thank you very much. Good morning, Your Honors. Good morning. My name is Anthony Norwood. I'm here today representing the respondent. Your Honors, Lu's testimony was internally inconsistent and inconsistent with her asylum application and documentary evidence with respect to material issues, such as when she allegedly began practicing Falun Gong, when she was terminated from her job. Let me ask you something. You're talking about the testimony before the IJ? Yes, Your Honor. Well, you know, at that time she was, I believe, represented by an attorney ineligible to practice in California. Do you know that? I was not aware of that. We ought to check those things for you. I was not aware of that. Keep your eyes up. I was not aware of that. And this is very common in these cases, very common in these cases, because the government has this view that like a disbarred lawyer is better than no lawyer. And, you know, that just creates problems for people, fraud. I mean, we've got – I can talk to you about this for the next two hours, but I'm tired today. Don't you check these things? I had not checked that, Your Honor, but it's not in the record. It's not a part of the record. All you've got to do is call the state bar. It's a public record. No, I imagine that he was authorized to practice before the immigration judge or the immigration judge. Yeah, because anyone can go before the immigration judge. Anyone can practice before the immigration judge. You just know how to be able to reach for money from immigrants. Counsel. Oh, I'm sorry. Yeah, go ahead. I'm sorry. Go ahead. Counsel, I'm interested in knowing how these inconsistencies go to the heart of the application. I mean, whether it's 97 or 98 or 98 or 99 that she began observing or practicing Falun Gong, how does that touch on the essence or the heart of what she's saying about the persecution she experienced? Well, we believe and contend that when she began practicing Falun Gong and why she began practicing Falun Gong does go to the heart of her asylum claim. But she's got no incentive to lie about that point, does she? I mean, whether it's 98 or 99 doesn't change the story in any significant way at all, does it? Well, it makes the story less reliable, Your Honor. It makes it less credible if the dates are not right. I mean, you would assume that one could remember when one began practicing Falun Gong. I can't remember dates. I have a really hard time with dates, and I've had that for a long time. And I just don't see how, especially when someone is, you know, being interpreted by someone who doesn't even speak their own dialect and then is emotional and has their whole life on the line, how slipping up and saying it's 97 or 98 goes to whether or not they actually were persecuted for practicing Falun Gong in China. It's not only the dates, Your Honor. It's when she started and why she started. She said she started to relieve pressure from her job, and then later she said she couldn't start or didn't start because of too much pressure from her job. And then at one point she says she started because, at the point where she started was because she moved in with her in-laws and her son had gotten through a certain level of school or something.  The country reports completely support the story of persecution of people who practice Falun Gong. I mean, you just read the State Department reports, and we know that that's happening. So the real question is, do you believe that she actually practiced? And she had that letter that said she was fired for practicing Falun Gong, which the IJ wouldn't even admit. Well, Your Honor, the country reports do say that. And so that does give applicants an opportunity to claim they're members of Falun Gong when they're not Falun Gong. And that's what the IJ thought here. And it's a question of whether the evidence compels the conclusion. The evidence presented to the immigration judge compels the conclusion that she suffered persecution and that she was credible. And he explained at the very opening of his statement, he explained that he's had a raft of people who have visas who legitimately came from China. They had work visas, and she was a manager. How did she get out of the country? If she was going to be arrested in Hsinchu, how was she allowed to get a visa that says manager and work in the United States for you? Why did they let her out if she was going to be arrested? The country was 1,250,000,000 people. I suppose it's not easy to keep track of everybody. There are probably lots of ways to get in and out and to get papers. That's true, Your Honor, but that also undercuts her claim that she would be subject to arrest. Her claim on what? That she would be subject to arrest if she returns to Hsinchu, if a billion people. I submit that undercuts her claim. The dismissal, let me start with the dismissal letter. That was not presented to the Board of Immigration Appeals as we presented in our brief. The challenge to the admission of the dismissal letter was not presented to the Board of Immigration Appeals. As I read the record this morning, the dismissal letter was not.  It was part of the record. It was accepted for identification purposes only, and the immigration judge. So the BIA, when it's doing these summary affirmances, doesn't look at the record? It does look at the record, Your Honor, but that was not admitted in the record, and the admission of it into the record was not challenged before the Board of Immigration Appeals. As the immigration judge pointed out, or the lawyer pointed out, this document is not even signed. It was never signed. It was not authenticated under the regulations, and it's of little weight when it's not even assigned by a Chinese judge. It's not authenticated by her own testimony. It could at some point, Your Honor, but the immigration judge ruled that it was not admissible. What significance did you attach to the statement in the brief before the BIA where the petitioner said, moreover, the documents submitted by the respondent, which were waived by ADC in a prior hearing and objected to by the IJ in this hearing, resulted in the respondent's loss of relevant supporting evidence? I mean, isn't that referring to the document that the petitioner relies most heavily on here, the dismissal letter, among others? It does. If the petitioner raises it before the BIA, the fact that the BIA doesn't reference it in its order does not mean that the petitioner has failed to exhaust in any way, shape, or form. They've done what they can do to bring it to the attention of the BIA, haven't they? Well, I saw it more as a fact and not as an argument that it should have been admitted, that it should have been authenticated by her own testimony. They stated it was not admitted, but not that it should have been admitted, and that it was error not to admit it. I really doubt that the BIA is even reading, one member of the BIA is even reading the record or the arguments because I would take that argument that way given this time frame the single judge BIA doing. I think we had reports they were doing 10 of these an hour. I doubt very much that that argument was even considered. That's right, we're overloaded with all these cases. We used to get about 800 a year, and I think one time we got 6,000 or 7,000. I think this brief was written in that time period, Your Honor. I think that's the oldest case. I think that's where this brief came up, Your Honor. Are they still doing that, by the way? I know that was an order under Attorney General Ashcroft. Is that still? They still have the authority to do that, and they have modified the way that the BIA handles cases. Prior to streamlining, it really got clogged up with a lot of large panels and very detailed decisions, and so the regulations are in place, but the numbers are not as big. Everybody's going, my office is going, everybody's offices are going. I wanted also to point about the interpreter. That also was not challenged, but when you read the transcript, it's clear that the immigration judge had a lot of respect for his interpreter. He pointed that out. He said when she needs to ask a question, she asks a question. I trust her, and at one point she does change a testimony. It was a question of whether it was October or November. She said, oh, that accent may have affected that, so I'm not sure what month she said. And the immigration judge said, well, I won't give that any credence. And then she also, it's interesting that everybody in the room and even the petitioner in his brief said that she said, wrote or said that she went to Beijing by plane. She changed her testimony, it looks like, about 45 minutes later, but everybody understood her to say that she flew to Beijing, and that was one inconsistency there. No further questions? You probably don't have interpreters available in every Chinese dialect, right? It's probably difficult to, it's a difficult process. I think it probably is, Your Honor, but they trusted the interpreter, and she seemed to do a good job. Yeah, but, you know, you don't know. Do you have the tapes? The tapes are available, Your Honor, but we don't have the tapes. You don't know, I mean, I've had cases where you have someone who speaks Armenian and the interpreter is from Egypt, and the party involved is from Istanbul, you know. They have trouble understanding each other. I understand that, Your Honor, but in this case, it seemed that it was a well-respected and good interpreter, and the immigration judge and people seemed to approve. No further questions? Okay, thanks. Thank you. Thank you very much. All right. I think that's about it.
judges: Pregerson, Wardlaw, Leighton